IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                                   **REPORT AND RECOMMENDATION**

v.

                                                   11-CR-00366-RJA-JJM

MISAEL MONTALVO,
                Defendant.
_____

        Defendant Misael Montalvo is charged with conspiring to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §846, and with the November 11, 2004 killings of Nelson and Miguel Camacho, in violation of 18 U.S.C. §§924(c)(1)(A)(iii), 924(j)(1), and 2. Superseding Indictment [68][1]. This case was referred to me by Hon. Richard J. Arcara for supervision of all pretrial proceedings [6]. Before me is defendant Misael Montalvo's pretrial motion to suppress statements made to law enforcement on November 19, 2011. Spitler Affidavit [127], ¶3.[2]

        An evidentiary hearing was held on October 2, 2013 [181], at which New York State Police ("NYSP") Investigator Geraldo Rondon testified.[3] The parties submitted post-hearing briefs [182, 191], and oral argument was held on March 17, 2014 [192]. For the following reasons, I recommend that the motion be denied.

___

[1]     Bracketed references are to the CM/ECF docket entries.

[2]     Montalvo's remaining pretrial motions are addressed in a separate Report, Recommendation and Order. Montalvo's suppression motion (Montalvo's Memorandum of Law [44], Point II) was initially filed by his former counsel, James Kousouros, Esq., and later adopted by his subsequent counsel, Kevin Spitler, Esq.

[3]     Investigator Rondon also submitted a detailed Affidavit (gov. ex. 3 [174-3]) in opposition to Montalvo's suppression motion.

# BACKGROUND

On November 19, 2011 Montalvo was traveling on Route 90 with his wife and co-defendant Carmen M. Justiniano Ramirez and their three children when his vehicle was pulled over at approximately 1:37 p.m. by authorities near Batavia, New York. Gov. Ex. 2 [42-4], p. 1 of 7.  The vehicle was seized to execute a search warrant (gov. ex. 8 [174-8]) which I issued on November 18, 2011 for the vehicle, and Montalvo and his family were transported to the NYSP barracks in Batavia, where the vehicle was to be searched.  Gov. Ex. 2 [42-4], p. 1.

Investigator Rondon testified that he arrived at the NYSP barracks in Batavia at 1:30 p.m., where he met Senior Investigator Josh Keats and Detective Mary Evans from the Buffalo Police Department, and was informed that the FBI would be executing a search warrant on Montalvo's vehicle.  October 2, 2013 hearing transcript [181], pp. 12-14, 57.  Investigator Rondon was previously familiar with the murders of Nelson and Miguel Camacho, and knew that Montalvo's name had surfaced in connection with the murders (id., p. 57).  He testified that they had no plan to discuss the Comachos' murders since it was an ongoing investigation, and that the "true purpose of the stop and the search warrant was . . . to obtain . . . drug evidence" (id., pp. 60-61).  If they did not find anything in the vehicle, Montalvo "was to be let go" (id., p. 60).

Montalvo was brought in 15 to 20 minutes later by FBI Special Agent ("SA") Christopher Flowers (id., p. 15).  He was handcuffed behind his back (id., p. 16) and Investigator Rondon understood that this was for officer safety (id., p. 25).  Investigator Rondon, who was not armed, introduced himself to Montalvo in Spanish and told him, "I would definitely be there for him to help translate, and that I was there for him" (id., pp. 16-17).  At SA Flowers' request,

Investigator Rondon advised Montalvo in Spanish that he was not under arrest and was being detained while a search warrant was being executed on his vehicle (id.).

Before Montalvo was led into an interview room by Investigator Rondon, SA Flowers and Investigator Keats, he inquired about his family and Investigator Rondon advised him that "they would be okay and they would be waiting in a waiting room right across the lobby" (id., p. 18). Montalvo also remarked, "usually when I get stopped by the troopers, I just get a ticket and then I'm on my way" (id.).

The interview room was approximately 10' by 10' in size, with a long table and four chairs (id., p. 22). Investigator Rondon sat in the chair next to Montalvo (id.). Montalvo was offered water and his handcuffs were moved from his back to his front (id., pp. 19, 25). When Investigator Rondon returned "less than a minute" later with water for Montalvo, SA Flowers "was already asking him questions, like . . . where was he coming from, where was he going, did he rent the car, questions like that" (id., p. 23). He was also asked his date of birth and names of his family members (id., pp. 20, 23). SA Flowers' questions were in English and Montalvo would answer in broken English, or Spanish, which Investigator Rondon translated for SA Flowers (id., p. 24).

After these questions were asked and answered, SA Flowers again told Montalvo that he was not under arrest and that he was being detained because of the search warrant being executed on his vehicle (id., p. 24). In response, Montalvo said "Okay, I understand. You guys got to do your job" and "I have nothing to hide. Tell them that they can check because I have nothing to hide" (id., p. 24). They then removed Montalvo's handcuffs and he said, "Yes, yes,

take them off, please, you know, I got nothing to hide, you know. I mean, I'll talk to you" (id., pp. 24-25).

Since Montalvo "was sweating" and "red faced", Investigator Rondon asked him if he was okay or needed medication (id., pp. 25-26). Montalvo responded that he was a diabetic, but stated that he did not need anything and was okay (id., p. 26). Thereafter, SA Flowers asked Montalvo, "Is there anything in the vehicle that we should know about?" (id., p. 26), and Montalvo responded, "I have nothing to hide, there's nothing in the vehicle" (id., p. 27).

At some point, Investigator Rondon left to get Montalvo another glass of water and when he returned, Montalvo started telling him that he had friends in the New York City Police Department (id., pp. 27-28). Investigator Rondon "began to just chat with him about that and ask[ed] him questions about . . . what precincts do they work in" because he also had friends that worked for the New York City Police Department (id.).

Thereafter, SA Flowers left the room and Investigator Rondon continued the conversation (id., p. 29). Investigator Rondon "just wanted to talk to him and build a rapport with Mr. Montalvo and ask about his background" (id., p. 29). He asked him where was he traveling to and if he was employed (id., p. 29), but did not ask him about any criminal activity (id., p. 30).

At some point, Montalvo inquired whether Investigator Rondon knew Roberto Rosas, a NYSP Trooper (id., pp. 20-21, 27). When Investigator Rondon asked Montalvo whether he wanted Rosas to be contacted, Montalvo said, "No, no, you know. I just know him from . . . Dunkirk, New York" (id., p. 21). Montalvo also inquired about the search warrant, and Investigator Rondon replied, "Yes, you know, there is a search warrant for your car and we're

going to be talking about that soon" (id., pp. 21-22). Montalvo also asked if his wife could join him in the interview room and Investigator Rondon told him "that his wife would be okay and would be waiting in the waiting room" and that they "would like to talk to him" (id., p. 22). In response, Montalvo said, "Okay, I have nothing to hide" (id.).

Montalvo again asked, "What's wrong - - what's up with this search warrant?" and Investigator Rondon responded, "Well, if you don't have nothing to hide then you don't have to worry about anything. And I'm just trying to get to know you anyway and you don't know me so . . . let's just talk about different things" (id., p. 30). They then talked about food and Puerto Rico (id.).

When Montalvo asked to use the bathroom, Investigator Rondon told him that he could not walk around the building unattended and accompanied him to the bathroom, where they continued their conversation about the family members Montalvo was traveling to visit in Lackawana, New York (id., p. 31). Since Investigator Rondon was familiar with Lackawana, Montalvo asked him if he knew his cousin (id., pp. 31-32).

After using the bathroom, Investigator Rondon got another glass of water for Montalvo before returning to the interview room, where they "started chatting again" (id., p. 32). In discussing his background, Investigator Rondon asked Montalvo if he ever lived in Buffalo (id., p. 33). At some point, Montalvo advised Investigator Rondon that he had some diabetic medication and Viagra in his vehicle and while Investigator Rondon left the interview room to advise SA Flowers, another individual entered the room to sit with Montalvo (id., p. 34). When Investigator Rondon returned to the interview room approximately 10 to 15 minutes later, he asked Montalvo whether his wife was going to need anything out of the vehicle for their children

(id., pp. 34-35). Investigator Rondon then checked with Montalvo's wife and advised her that Montalvo was okay (id., p. 35). When Investigator Rondon went to the garage where the vehicle was being searched to get an asthma pump Montalvo's wife had requested, he observed one of the officers retrieving a package from the vehicle, and he knew that an illegal substance had been discovered (id., pp. 36, 66).

Upon returning to the interview room, Montalvo said, "Listen, I ain't got nothing to hide . . . how long is this going to take?" (id., pp. 36-37). Investigator Rondon responded, "It shouldn't take that long. But as soon as the special agent comes back in the room, I'll ask him how long . . . it will take, but it shouldn't take that long" (id., p. 37). He also asked, "Was there anything in the vehicle that we should know about?" (id.). Montalvo again responded, "No, I have nothing to hide" (id.).

Shortly thereafter, SA Flowers and another agent entered the room, placed a black bag or package on the table and advised Montalvo that he was under arrest for possession of a controlled substance (id., pp. 37, 65). SA Flowers read Montalvo his Miranda rights in English and he responded, "Yes, I understand", and then they were read to him in Spanish by Investigator Rondon and he said, "Yes, yes, I understand, but . . . let them know, Geraldo, . . . that stuff is not mine" (id., pp. 37-38, 41, 66). Montalvo was advised of his Miranda rights at approximately 4:30 p.m. (id., p. 58).

After being Mirandized, it "took some time to calm [Montalvo] down and talk to him" (id., p. 42). Investigator Rondon attempted to build a rapport with him by asking him again about where he was traveling (id., p. 42). At SA Flowers' request, Investigator Rondon asked Montalvo in Spanish whether he knew "about any criminal activity that may help him" (id., pp.

42-43). Investigator Rondon also told Montalvo in English that they were not making him any promises (id., p. 67). After Montalvo expressed confusion about what was meant by "criminal activity", SA Flowers said "anything like drugs, drug trafficking, or murders" (id., p. 43). Before Investigator Rondon could translate, Montalvo said, "Did he say homicides?" (id., pp. 44, 67-68). At this point, Montalvo "began to look worried" and "seemed very nervous" (id., p. 43). Investigator Rondon again asked him whether he was okay and Montalvo responded, "No, I'm good. But you can tell them that that's not mine" (id.).

They then began to have a conversation about the period Montalvo lived in Buffalo, and he explained that he left Buffalo in 2004 because "[p]eople were spreading negative rumors about [him]" (id., p. 44). SA Flowers exited the room and Investigator Rondon introduced Montalvo to Detective Evans and Investigator Keats, but they exited the room without asking Montalvo any questions (id., pp. 46-47, 68). Investigator Rondon continued his interview of Montalvo and questioned him about his activities in Buffalo and his knowledge of the murders of Nelson and Miguel Camacho (id., pp. 47-49).

Investigator Rondon showed Montalvo photographs of Uda Hildago and co-defendants Efrain Hildago and Brandon Jonas that he obtained from Detective Evans and Investigator Keats and asked him about these individuals (id., pp. 49-51). Because Montalvo appeared worried and nervous, Investigator Rondon asked him again if he was okay and "touched him to console him" (id., p. 51).

When Montalvo expressed concern about the safety of his family, Investigator Rondon advised him that they would try to protect his family (id., p. 53). After discussing the Camachos' funeral, Montalvo became very emotional and asked for a lawyer (id., p. 55). The

interview concluded at that time, and no further questions were asked of Montalvo (id.).  No threats, promises, or tricks were made by anyone during the interview (id., p. 55).

Although Montalvo elected not to testify at the hearing, he submitted an Affidavit [54], which appears generally consistent with Investigator Rondon's testimony.  He states that he was questioned about where he was going and why he was traveling to Buffalo and that hours later he was told that he was "going to be taken to court for drugs found in the truck" and then questioned about the drugs and murders (id., ¶¶8-9).  Montalvo also states that he was not Mirandized "when [he] got to the precinct" (id., ¶6).  However, he states that he asked to call a lawyer, but was not permitted to use the telephone (id., ¶6).

Montalvo initially sought to suppress his statements as being taken in violation of Fifth and Sixth Amendment[4] rights, arguing that 1) he was initially subjected to a custodial interrogation without the benefit of Miranda warnings, 2) he "requested an attorney from the onset of his detention and was not given an opportunity to secure counsel", 3) when he was given Miranda warnings, they were given only in English, which he did not understand, and 4) even if he was properly Mirandized, it did not "vitiate the taint of the initial uncounseled interrogation which preceded it".  Montalvo's Memorandum of Law [44], Point II.

---

[4] "[T]he Fifth Amendment right to counsel applies when a defendant is subject to custodial interrogation".  United States v. Medunjanin, 2012 WL 1514766, *7  (E.D.N.Y. 2012). However, it is not clear what Sixth Amendment claim Montalvo is asserting since "[t]he Sixth Amendment right to counsel attaches upon indictment".  United States v. Bing Yi Chen, 433 Fed.Appx. 14, 15 (2d Cir.2011) (Summary Order).  See United States  v. DePonceau,  2008 WL 222520, *10 (W.D.N.Y. 2008) (Payson, M.J.), adopted, 2008 WL 624110 (Larimer, J.).

## ANALYSIS

In Montalvo's post-hearing brief he argues that was subjected to a custodial interrogation before receiving <u>Miranda</u> warnings and that "the conduct of law enforcement overbore defendant's will and rendered confession that were not self-determined". Montalvo's Post-Hearing Memorandum of Law [191], p. 3 of 3.[5]

### A.  Was Montalvo Subjected to a Custodial Interrogation Without the Benefit of <u>Miranda</u> Warnings?

"A suspect is entitled to <u>Miranda</u> warnings only if he or she is interrogated while 'in custody.'" <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 243 (2d Cir. 1998). "On a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation. Once the defendant establishes a basis for his motion, however, the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." <u>United States v. Broughton</u>, __ F.Supp.2d__, 2013 WL 5744473, *3 (E.D.N.Y. 2013) (internal quotations omitted); <u>United States v. Miller</u>, 382 F.Supp.2d 350, 362 (N.D.N.Y. 2005) ("since Miller has alleged police custodial interrogation in the absence of <u>Miranda</u> warnings, the burden shifts to the government to prove <u>Miranda</u> voluntariness, either because there was no custodial interrogation implicating <u>Miranda</u>, there was some exception to

---

[5]  Although Montalvo's initial suppression motion also argued that he was only Mirandized in English and that law enforcement continued to question him despite his requests for counsel, I consider these arguments, which are not raised in his post-hearing brief, to be abandoned. Moreover, while the voluntariness of Montalvo's statements was first raised in his post-hearing brief, the government has not objected to the timeliness of this argument. Therefore, I will consider this argument.

the Miranda rule, or because Miller was properly Mirandized and waived his rights" *citing* Lego v. Twomey, 404 U.S. 477, 489 (1972)). *See also* United States v. Connelly, 2007 WL 3124538, *8 (W.D.N.Y. 2007) (Siragusa, J.) ("The government bears the burden of proving by a preponderance of the evidence both, that in the absence of Miranda warnings, and that the interrogation of a defendant was non-custodial").[6]

The word "'custody' for Miranda purposes is not coterminous with, though it is often informed by, the colloquial understanding of custody". United States v. FNU LNU, 653 F.3d 144, 152-53 (2d Cir. 2011). Instead, "the overarching . . . question is whether a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest". Id.

Thus, an interrogation is deemed "custodial" only where "a reasonable person would not have thought himself free to leave", *and* "would have understood his freedom of action to have been curtailed to a degree associated with formal arrest". United States v. Newton, 369 F.3d 659, 672 (2d Cir.), cert. denied, 543 U.S. 947 (2004). "Only if the answer to this second question is yes was the person in custody . . . and entitled to the full panoply of protections prescribed by Miranda. " Id. While the court "must examine all of the circumstances surrounding the interrogation . . . the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest". Id. at 670.

---

[6] *Compare with* United States v. Abbas, 418 F.Supp.2d 280, 285 (W.D.N.Y. 2006) (Larimer, J.) (" For purposes of this hearing, I assume that the defendant has the burden of demonstrating that he was subjected to custodial interrogation"); United States v. Stone, 2013 WL 5274850, *3 (D.Vt. 2013) ("A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation").

While I conclude that a reasonable person in Montalvo's position would not feel free to leave, I further conclude that the same person would *not* "have understood his freedom of action to have been curtailed to a degree associated with formal arrest" (Newton, 369 F.3d at 672) at that time.

"[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981). Thus, "[t]he fact that Defendant was physically detained and handcuffed while the search warrant was executed does not necessitate a finding that Defendant was under arrest or in 'custody.'" United States v. Toumasian, 2011 WL 3798223, *10 (N.D.Ga.), adopted, 2011 WL 3738980 (N.D.Ga. 2011).

"[D]ecisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave". United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). Significantly, Montalvo was expressly advised twice at the NYSP barracks[7] that he was not under arrest and that he was being detained while the search warrant was executed. October 2, 2013 hearing transcript [181], pp. 16-17, 24.  Although being handcuffed is "generally recognized as a hallmark of a formal arrest" (Newton, 369 F.3d at 676),  Montalvo's handcuffs were removed.  Furthermore, Investigator Rondon was also not armed during his interactions with Montalvo (October 2, 2013 hearing transcript [181], p. 17) and their discussions did not focus on Montalvo being a suspect or concern criminal activities.

---

[7]    SA Flowers' report (gov. ex. 2 [174-2]) states that before Montalvo was transported to the NYSP barracks, he advised him that he was being detained and not under arrest (id., p. 1).

However, the fact that Montalvo was transported to the NYSP barracks and was separated from his family points toward him being in custody. *See* United States v. Hamilton, 2012 WL 1029450, *4 (W.D.Ky. 2012) ("Forcefully separating a [defendant during the execution of a search warrant] for questioning during the search also increases the chances of custodial interrogation"). Although this is a close call, on balance I conclude that Montalvo was not in custody prior to being Mirandized.

Moreover, even if Montalvo had been in custody, nearly all of his pre-Miranda statements were not the product of an interrogation.[8] "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent ", which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The functional equivalent test "focuses primarily upon the perceptions of the suspect, rather than the intent of the police". Id. at 301. However, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." Id. at 302 n.8.

On two occasions, Montalvo was asked if there was anything in the vehicle that the officers should know about. October 2, 2013 hearing transcript [181], pp. 16-17, 26. These

---

[8] Montalvo does not specifically identify any questions that he contends constituted interrogation.

questions were reasonably likely to elicit an incriminating response from Montalvo, and if it is determined that Montalvo was in custody, should be suppressed. Indeed, the government appeared to concede this at the March 17, 2014 oral argument.[9]

Beyond these two statements, Montalvo's statements were either: 1) volunteered, which "are admissible even though Miranda warnings were not provided", United States v. Jacobson, __F.Supp.2d __,2014 WL 962227, *15 (E.D.N.Y. 2014); 2) made in response to routine or pedigree questions, which do not constitute interrogation (*see* United States v. Thomas, 961 F.Supp. 43, 45 (W.D.N.Y.1997) (Arcara, J./Foschio, M.J.) ("Routine questions, innocent of any investigative purpose, do not pose the dangers Miranda was designed to check"); United States v. Rodriguez, 356 F.3d 254, 259 n. 2 (2d Cir. 2004) ("information solicited through routine questioning of arrested persons by law enforcement officers at the booking stage does not implicate the protections of Miranda"); United States v. Adegbite, 846 F.2d 834, 839 (2d Cir. 1988) ("the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by Miranda")); or 3) or were the product of polite conversation between Montalvo and Investigator Rondon, which also does not constitute interrogation. *See* United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation"); Mickey v. Ayers, 606 F.3d 1223, 1235 (9th Cir. 2010), cert. denied, __ U.S.__, 132 S.Ct. 419 (2011) ("Casual conversation is generally not

---

[9] The government acknowledged that on the "two or three occasions prior to the recovery of the drugs where he asked if there are any drugs and Montalvo issued a denial, that was pre-Miranda. I suppose . . . if the court finds he is in custody that is something that can be construed as interrogation because it focused on drugs, but there was a denial in any event, it is certainly not something I am not going to be introducing at trial". Unofficial chamber's transcription of the March 17, 2014 oral argument.

the type of behavior that police should know is reasonably likely to elicit an incriminating response").

Therefore, I recommend that Montalvo's motion to suppress his pre-Miranda statements be denied.[10]

**B.    Were Montalvo's Statements Voluntary?**

"The government bears the burden of demonstrating that the defendant's statements were voluntary." United States v. Siddiqui, 699 F.3d 690, 707 (2d Cir. 2012), cert. denied, __ U.S.__, 133 S.Ct. 2371 (2013). "To determine whether a defendant's statements were made voluntarily, courts look to the totality of the circumstances surrounding the statements." Id. "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials". Green v. Scully, 850 F.2d 894, 901-02 (2d Cir.), cert. denied, 488 U.S. 945 (1988).

Montalvo argues that "[i]n a brief period of time the allegations against [him] went from speeding, to a search warrant, to a drug charge to discussion of murders" and that "[t]his type of escalation . . . was intended to overbore [his] will and render his subsequent statements not self-determined". Montalvo's Post-Hearing Memorandum of Law [191], p. 3 of 3. The government responds that "there is no evidence that the officers coerced any of the

---

[10]    Since I have concluded that Montalvo was not subjected to a custodial interrogation prior to being advised of his Miranda warnings, it is unnecessary for me to determine whether the failure to initially provide him with Miranda warnings rendered Montalvo's postwarning statements inadmissible.

defendant's statements, or that they otherwise created circumstances calculated to undermine his free will". Government's Post-Hearing Memorandum of Law [182], p. 22. I agree with the government.

Although this was an orchestrated encounter with Montalvo, I credit Investigator Rondon's testimony that no threats or promises were made to Montalvo, and that the questioning promptly ceased upon Montalvo's request for counsel. October 2, 2013 hearing transcript [181], p. 55. The fact that Montalvo was asked whether he would be willing to help himself by sharing his knowledge of criminal activities (id., pp. 42-43) does not render his subsequent statements coercive. "Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive. . . . Statements such as these are merely common sense factual observations." United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995), cert. denied, 516 U.S. 1182 (1996). See United States v. Tutino, 883 F.2d 1125, 1138 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990) (It is not coercive for law enforcement "to discuss with [a defendant] the evidence against him and the reasons why he should cooperate"); United States v. Crosby, 2010 WL 3304272, *4 (W.D.N.Y. 2010) (Arcara, J./Scott, M.J.) ("Even if [the defendant's] statement was made in response to the officer's question whether Peace wanted to 'help yourself out' . . ., that statement was not the product of coercion").

While Montalvo became emotional when the discussion turned to the murders of Nelson and Miguel Camacho, nothing in the record indicates that the tenor of the questioning became threatening or even accusatorial. Indeed, Investigator Rondon was trying to console Montalvo and keep him calm. October 2, 2013 hearing transcript [181], p. 55. Therefore, I

conclude that Montalvo's statements were voluntary, and recommend that his motion to suppress his November 19, 2011 statements be denied.

## CONCLUSION

For these reasons, I recommend that Montalvo's motion to suppress his November 19, 2011 statements (Spitler Affidavit [127], ¶3) be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by May 5, 2014 (applying the time frames set forth in Fed. R. Crim. P. ("Rules") 45(a)(1)(C), 45(c), and 59(b)(2)).  Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not

raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED:     April 16, 2014

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge