UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,


                    v.                                    **DECISION AND ORDER**
                                                              11-CR-366-A

MISAEL MONTALVO,

                              Defendant.

_____

          This case is before the Court to determine the offense level under the Sentencing

Guidelines that applies to defendant Misael Montalvo's conviction upon his guilty plea to

conspiracy to distribute five or more kilograms of cocaine in violation of 18 U.S.C. § 846.

The Court held a *Fatico*[1] hearing concerning whether defendant Montalvo was involved

in the murders of two alleged former co-conspirators during an armed burglary and rob-

bery, and whether the murders constitute relevant conduct in relation to the defendant's

drug conspiracy offense of conviction.

          The United States argues that evidence introduced during the *Fatico* hearing es-

tablishes that defendant Montalvo planned, aided and abetted the armed burglary and

robbery during which the murders of his former co-conspirators occurred, and it con-

cludes that his Guidelines offense level must account for the murders even though he

did not personally commit them.  It relies upon a Guidelines cross-reference at § 2D1.1

that applies to drug trafficking offenses when a victim is murdered that requires the

Court to use the offense level for murder at § 2A1.1 when imposing sentence upon a

_____
[1] *United States v. Fatico,* 603 F.2d 1053 (2d Cir. 1979).

defendant if it results in a higher offense level.  U.S.S.G. § 2D1.1(d)(1).  If the United States is correct that the murder cross-reference applies in this case, the defendant's adjusted offense level will be 40 and it appears that he faces an advisory range of imprisonment of 292 to 365 months.

Defendant Montalvo denies any role in the armed burglary and robbery or the murders.  He presented alibi evidence during the *Fatico* hearing to dispute that he had a role in the burglary and robbery, let alone the resulting murders.  If the defendant is correct, it appears his offense level will be 29 and that he faces the mandatory-minimum term of imprisonment for his drug conspiracy offense of conviction of 120 months and a maximum term of life imprisonment.

For the reasons stated below, the Court concludes that the Guidelines § 2D1.1(d)(1) cross-reference to the murder Guideline at § 2A1.1 does not apply in this case.  In summary, a murder must be "relevant conduct" to a drug trafficking offense of conviction under Guideline § 1B1.3 for the murder cross-reference to apply.  *See e.g.*, *United States v. Taylor*, 813 F.3d 1139, 1150 (8th Cir. 2016).  Here, because the Court finds that the United States has not established by a preponderance of the evidence that the murders occurred during, in preparation for, or in attempting to avoid responsibility for defendant Montalvo's drug conspiracy offense of conviction, *see* U.S.S.G. § 1B1.3(a), the murders do not constitute relevant conduct with respect to the offense of conviction.

Nevertheless, the Court finds by a preponderance of the specific evidence before it that defendant Montalvo planned, aided and abetted the armed burglary and robbery during which the murders occurred and that an upward departure or variance to reflect

2

his role in the murders of his former co-conspirators is warranted.  The defendant faces charges of two counts of aiding and abetting discharge of a firearm causing death in violation of 18 U.S.C. § 924(c) based upon the murders, and both counts are to be dismissed as part of the defendant's plea agreement.  Sentencing Guidelines § 5K2.21 explicitly authorizes an upward departure when conduct that underlies counts to be dismissed is not otherwise considered in determining an advisory sentencing range.  The Court therefore finds that Guidelines § 5K2.21 applies, and the parties are directed below to address in writing the method the Court should use to determine the extent of a § 5K2.21 upward departure or whether a variance based on the dismissed conduct is more appropriate.

## BACKGROUND

Defendant Montalvo pled guilty to one count of a Superseding Indictment that charges him with conspiracy to possess with intent to distribute, and to distribute, five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 841(b)(1)(A).  The defendant admitted in his plea agreement and during his guilty plea colloquy that:

> [f]rom approximately 2000 through 2004, [he] resided in the Buffalo area and sold cocaine, with others, in the Buffalo area.  From approximately 2004 through November 19, 2011, the defendant periodically traveled from New York City, with co-defendant Carmen M. Justiniano Ramirez, to distribute cocaine to customers in the Buffalo area.

Dkt. No. 248, para. 4.a.  The defendant admitted that approximately 15 to 50 kilograms of cocaine is the total relevant drug quantity involved in his offense of conviction.

Defendant Montalvo's plea agreement and colloquy further reflect the parties' agreement that  "[o]n November 11, 2004, Nelson Comacho and Miguel Camacho were

shot and killed inside their residence at 879 Niagara Street, Buffalo, New York."   Dkt. No. 248, para. 4.c.  The parties' factual agreements end there.

The United States maintains in the plea agreement that the murders of Nelson and Miguel Comacho are properly to be considered relevant conduct to defendant Montalvo's drug conspiracy offense of conviction.  It maintains that the Guidelines § 2D1.1(d)(1) cross-reference to the murder Guideline at § 2A1.1 therefore applies and the defendant's base offense level is 43.

Defendant Montalvo, on the other hand, disputes that he participated in the armed burglary and robbery during which the murders were committed.  He maintains that his base offense level, taking account of the total relevant drug quantity for his offense of conviction, is properly calculated at level 32.

Although the parties have not focused on it, the Superseding Indictment also charges defendant Montalvo and two co-defendants, Efrain Hidalgo and Brandon Jonas, with two counts of discharge of a firearm during and in relation to a crime of violence or a drug-trafficking crime causing death in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1) and 2.  One of these counts is based upon the murder of Nelson Comacho, the other upon the murder of Miguel Comacho.  Nelson and Miguel Comacho, who were brothers, were the victims who were shot to death during a November 11, 2004 armed burglary and robbery at their apartment at 879 Niagara Street, lower, in Buffalo.

While the Superseding Indictment also alleges that the two counts of discharge of a firearm causing death justify imposition of the death penalty upon defendant Montalvo and his co-defendants, Dkt. Nos. 68, pp. 4-5, the United States decided not to

4

seek the death penalty well before the defendant entered into his plea agreement.  Dkt. No. 95.   And the plea agreement provides the two death-eligible counts will be dismissed as against the defendant when sentence is imposed upon him for the drug conspiracy count.  Dkt. No. 248, para. 14.

To resolve the factual issues underlying the parties' dispute whether the drug Guidelines murder-cross reference applies to defendant Montalvo's offense of conviction, the Court held the *Fatico* hearing.  *See* U.S.S.G. § 6A1.3   The hearing took place over three days, during which the Court heard from nine witnesses and received numerous items of evidence.

## DISCUSSION

A correct calculation of the Sentencing Guidelines adjusted offense level and criminal history category together result in an applicable Sentencing Guidelines range of imprisonment derived from the Sentencing Table, U.S.S.G. ch. 5, Pt. A, which becomes "the starting point and initial benchmark" before imposition of a sentence.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  By using this range of imprisonment as the starting point and benchmark when imposing sentence, federal courts avoid unwarranted sentencing disparities through nationwide consistency.  *Id.*

A court may not presume that a correctly calculated Guidelines range of imprisonment will result in a reasonable sentence in a particular case, *Gall*, 552 U.S. at 50, and must "consider the widest possible breadth of information about a defendant [to] ensure[] that the punishment will suit not merely the offense but the individual defendant" as well.  *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quotation omitted).  To that end, 18 U.S.C. § 3661 provides that "[n]o limitations shall be placed on the information

concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Reflecting some of this breadth of information, Guidelines base offense levels and offense level adjustments routinely set the initial benchmark range of imprisonment based upon what a defendant actually did, and not simply based upon what the defendant has been adjudged guilty of doing.  *See e.g.*, *United States v. Watts*, 519 U.S. 148, 151-57 (1997) (offense-level calculations can include conduct underlying offenses of which a defendant is acquitted); *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000) (offense level calculation for drug conspiracy required consideration of § 2D1.1(d)(1) cross-reference to § 2A1.1 murder offense level).  In this way, the Guidelines reflect a studied compromise between a charge-offense system of sentencing that is based exclusively on charged and proven conduct and a real-offense system that allows sentencing based upon uncharged conduct that a judge concludes warrants punishment.  U.S.S.G. ch. 1, pt. A, § 4(a).

Under the Sentencing Guidelines, a principal concept to determine whether conduct is to be included in a Guidelines offense level calculation is whether the conduct qualifies as "relevant conduct."  Under Guidelines § 1B1.3(a), "relevant conduct," at least as is pertinent here, includes:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were —

6

> > (i)     within the scope of the jointly undertaken criminal activity,
>
> > (ii)     in furtherance of that criminal activity, and
>
> > (iii)     reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> \*   \*   \*
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; . . . .

*Id.* (ellipsis added). Generally, "to qualify as 'relevant conduct,' the conduct must occur in the course of commission of the offense of conviction." *United States v. Wernick*, 691 F.3d 108, 115 (2d Cir. 2012).

When a factual dispute over relevant conduct exists, the disputed conduct must be proved by a preponderance of the evidence before it can be considered relevant conduct under the Guidelines. *See Witte v. United States*, 515 U.S. 389, 401 (1995); *Cordoba-Murgas,* 233 F.3d at 708-10. The Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. 1101(d)(3). A court can consider hearsay evidence, if it is reasonably reliable, *see United States v, Martinez*, 413 F3d 239, 243-44 (2d Cir. 2005), and can rely upon testimony from related proceedings, provided the defendant has a meaningful opportunity to respond. *United States v. Concepcion*, 983 F.3d 369, 387-88 (2d Cir. 1992). Where such disputed conduct is not part of convicted conduct, such as where conduct underlying charges that are to be dismissed as part of a plea agreement

is involved, the conduct must be proved by specific evidence that meets the preponder-

ance of the evidence standard.  *See e.g.*, *United States v. Archer*, 671 F.3d 149, 165

(2d Cir. 2011).

## FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**I.  The Defendant Aided and Abetted Felony Murders.**  Specific evidence be-

fore the Court establishes that, although defendant Montalvo did not plan for his co-de-

fendant Brandon Jonas to kill the defendant's former co-conspirators Nelson and Miguel

Comacho, the defendant did aid and abet the armed burglary and robbery during which

Jonas intentionally shot and killed the victims.  First degree murder is defined in 18

U.S.C. § 1111(a) as:

> Murder is the unlawful killing of a human being with malice aforethought.
> Every murder perpetrated by poison, lying in wait, or any other kind of willful,
> deliberate, malicious, and premeditated killing; or committed in the perpe-
> tration of, or attempt to perpetrate, any arson, escape, murder, kidnapping,
> treason, espionage, sabotage, aggravated sexual abuse or sexual abuse,
> child abuse, burglary, or robbery; or perpetrated as part of a pattern or prac-
> tice of assault or torture against a child or children; or perpetrated from a
> premeditated design unlawfully and maliciously to effect the death of any
> human being other than him who is killed, is murder in the first degree.

Killings during and as a consequence of a knowing and willful burglary and robbery are

felony murders under § 1111(a).  *See e.g.*, *United States v. Thomas*, 34 F.3d 44, 48 (2d

Cir. 1994).

Here, the Court finds that defendant Montalvo orchestrated the armed burglary

and robbery during which the murders of the Comachos occurred.  He selected the lo-

cation of the armed burglary and robbery at the apartment at 879 Niagara Street, lower,

because he knew the victims lived there and he was targeting the victims' property.  He

recruited Jonas, Hildalgo, and a juvenile, by relying on the assistance of others who

knew them.  He met with them at the Ortiz family's residence at 482 7th Street, where he briefed the others and led most of the planning.  He described the interior of the victims' two-bedroom apartment.  He told them what to expect, including where to look for money, and that he thought no guns would be present.

The evening of November 11, 2004, while defendant Montalvo led planning among his co-defendants of the armed burglary and robbery in the Ortiz's kitchen at 482 7th Street, Jonas wiped off bullets from an AK-47 rifle that he was to carry during the burglary and robbery and then re-loaded the bullets into the clip for the rifle.  Shortly thereafter, the defendant drove Jonas, Hildalgo, and the juvenile, with the loaded AK-47 rifle and an aluminum baseball bat, to the vicinity of the victims' apartment in his yellow automobile and dropped them off expecting them to use the AK-47 and baseball bat to commit the burglary and robbery.  He did not accompany them further and drove away from the scene.

After Hildalgo smashed in the door to the victims' apartment with his shoulder sometime after 9:00 p.m., Jonas ran inside and immediately shot Nelson Comacho in the arm with the AK-47, nearly blowing the victim's arm off.  Nelson Comacho asked for help.  Hildalgo approached Nelson Comacho on the floor, asked him where the money was, and poked him with the aluminum bat to try to force an answer.  When Nelson Comacho did not answer, Hildalgo pulled a gold necklace from Comacho's neck and went to search for the money.[2]

After Hildalgo and the juvenile did not immediately find money in a front bedroom, where the defendant led them to believe money might be hidden, Hildalgo broke

---

[2] The parties sometimes refer to the robbery as an attempt, but Hildalgo pulled the gold necklace from Nelson Comacho's neck with intent to take it.

open the door to rear bedroom, only to frantically retreat to the front of the apartment when Miguel Comacho aimed a gun at him.  Jonas interceded, shooting Miguel Co-macho repeatedly with the AK-47, killing him.  With police expected to arrive because of the initial gunfire, and as Hildalgo and the juvenile ran — not having searched the rear bedroom —- Jonas stood over the already gravely injured Nelson Comacho and shot him through the head, killing him, before running away with the others.  No money or drugs were stolen from the Comachos or their apartment during the armed burglary and robbery.

As Hildalgo, Jonas, and the juvenile made their way back to the Ortiz's at 487 7th Street, they hid the AK-47 is some bushes and tried to avoid police.  Once safely inside, they gave their clothing, some of which was bloody, to Mrs. Sonya Ortiz, who stuffed it in a bag and gave them other clothes to wear.  The bag was then hidden in a hole in the wall of their basement by Sammy Ortiz, Jr.

When defendant Montalvo and Sammy Ortiz, Sr., returned to the Ortiz's after the bloody clothes were hidden, Hildalgo and Jonas confronted the defendant and accused him of using them. Jonas told the defendant he would kill him, and that the defendant had to leave town because there was nothing in the apartment to steal and two people were now dead.  About five days later, the defendant sold his yellow Toyota Tercel and unexpectedly moved to New York City.

Although defendant Montalvo did not deliberately plan for Jonas to commit the murders, the murders were a consequence of the defendant's knowing and willful con-duct to aid and abet the armed burglary and robbery during which the murders were committed.  The Court therefore concludes by a preponderance of the credible specific

evidence that the defendant committed felony murders under § 1111(a) as an aider and abettor.

Defendant Montalvo disputed his role in the armed burglary and robbery, and thus the murders, during the *Fatico* hearing by introducing an alibi and by stressing inconsistencies and gaps in the testimony of the United States' witnesses against him. He relied primarily on testimony of witnesses who testified that he spent almost the whole evening of November 11, 2004, at 571 Niagara Street in Buffalo with his girlfriend, Carmen M. Justiniano Ramirez, and her father, Segundo Justiniano, watching wrestling on television.  If that were true, he could not have led the planning of the armed burglary and robbery that occurred at the Ortiz's, and he could not have driven Hildalgo, Jonas, and the juvenile from the Ortiz's to the vicinity of the Comachos' residence and dropped them off to commit the burglary and robbery.  If that were true, he would not have later stated to his girlfriend words to the effect that he "took them there, dropped them off, and left," referring to his having dropped off Hildalgo, Jonas, and the juvenile in the vicinity of the victims' apartment on the night of the murders.

Although defendant Montalvo is correct that the United States' evidence of the defendant's role in the armed burglary and robbery is not totally consistent, the Court finds that the evidence firmly establishes that the defendant orchestrated the armed burglary and robbery, and that he dropped off his co-defendants and the juvenile near the Comachos' apartment, specifically intending that they would use the AK-47 and the baseball bat to commit the burglary and robbery.  Although the Court finds it likely that the defendant spent some time at 579 Niagara Street during the evening of the murders, the alibi witnesses' testimony that he was there nearly the entire evening there is

11

not believable, especially in view of the strong credible evidence of what the defendant did to aid and abet the armed burglary and robbery that evening.

### II.  The Murders are not Relevant Conduct to the Offense of Conviction.

Defendant Montalvo's drug conspiracy offense of conviction involved conduct in two distinct time frames.  During a period from in or before 2000 through late 2004, the defendant lived in Buffalo and sold cocaine in Buffalo with Nelson and Miguel Comacho, who were close childhood friends, and others.  After the defendant moved to New York City in late 2004 within days after his involvement in the Comachos' murders, the defendant periodically traveled to Buffalo with cocaine that he sold to customers in the Buffalo area.

During most of approximately four-year earlier phase of the conspiracy, when defendant Montalvo lived in Buffalo, the defendant met approximately weekly with Nelson and Miguel Comacho and their older brother about their combined cocaine trafficking, in private, in the rear bedroom of the Comachos' apartment at 879 Niagara Street, lower, where the felony murders later occurred.  The defendant and the Comachos had been close friends since childhood.

Nelson Comacho's teenaged girlfriend lived in the apartment with Nelson and Miguel during this time period.  She was strictly kept out of the private discussions concerning cocaine trafficking that took place in the rear bedroom, but she nevertheless saw bags of cocaine and overheard conversations about cocaine in the apartment.

In or about early 2003, Nelson Comacho's girlfriend pressed her ear to the rear bedroom door behind which defendant Montalvo, Nelson and Miguel Comacho were meeting privately, and she overheard the three co-conspirators talking about 10 pounds

of cocaine.  That amount is consistent with other evidence of the drug quantity involved in the drug conspiracy offense of conviction.  No evidence from this approximate four-year time period indicates whether the co-conspirators shared sources of supply, shared customers, or establishes nature of the co-conspirators' relationships with each other within their drug trafficking conspiracy, however.

No evidence before the Court specifically shows how the felony murders in November of 2004 arose out this earlier four-year phase of defendant Montalvo's drug conspiracy offense of conviction, in which the Comachos participated.  There is evidence before the Court that the defendant told Hildalgo, Jonas and the juvenile that there would be five kilograms of cocaine in the apartment to steal as well as $10,000, but Hildalgo, for example, testified they were told only about money.  There was no evidence the planned theft was to satisfy a drug-debt that arose out of the Comachos' participation in the defendant's offense of conviction, or otherwise involved a dispute arising out of that drug trafficking conspiracy.  There was no evidence that the defendant and the Comachos had previously possessed cocaine for distribution they had obtained by violence or threat of violence.

In late 2003, defendant Montalvo tried to force himself on Nelson Comacho's young girlfriend as he was driving her home from a visit with the defendant's girlfriend. Nelson Comacho's girlfriend was approximately 16 years of age at the time, and the defendant pulled his car over, tried to kiss her, and grabbed forcibly at her shirt.  The young woman resisted and screamed at him to stop.  She was able to break away and get out of the car and run to the apartment at 879 Niagara Street, lower.

13

The young woman was upset but was also very frightened about what Nelson Comacho might do to defendant Montalvo if he found out the defendant had sexual assaulted her.  A short time later, on New Year's Eve 2003, Nelson Comacho and his family did find out what the defendant had done, and had tried to do, to the young woman. The whole family was extremely angry about what they learned the defendant had done.  The young woman heard them screaming at the defendant over the telephone, and the defendant was never allowed in their company again.  He no longer participated with them in cocaine trafficking, let alone in the weekly private meetings concerning cocaine trafficking in the rear bedroom of the lower apartment at 879 Niagara Street.  The co-conspirators falling out coincided with the end of the earlier timeframe of the defendant's conspiracy offense of conviction.

Defendant Montalvo and Nelson Comacho had a fist fight at a barber shop a few months after the sexual assault.  And they may have had a further falling out just three weeks before the murders on November 11, 2004.  In any event, the defendant admitted to a law enforcement officer years later that he had a falling out with Nelson Comacho after, as he put it, he "made a pass" at Comacho's girlfriend, and the defendant admitted being threatened and blamed by people for the brothers' murders.

During the later phase of defendant Montalvo's drug conspiracy after the murders, the defendant lived in New York City and would periodically travel to Buffalo to supply cocaine to customers in the Buffalo area.  He had a source of supply in the New York City area, and there is no evidence before the Court that he sold cocaine anywhere other than Buffalo.

As stated above, a murder must be "relevant conduct" to a drug trafficking offense of conviction under Guideline § 1B1.3 for the cross-reference at Guidelines § 2D1.1(d)(1) to apply and a potentially higher murder offense level at Guideline § 2A1.1 to be used.  *See e.g.*, *United States v. Taylor*, 813 F.3d 1139, 1150 (8th Cir. 2016).  A murder is not relevant conduct to a drug conspiracy under the Guidelines merely because the murder was within the time frame of the conspiracy.  *United States v. Wernick*, 691 F.3d 108, 115 (2d Cir. 2012).  Ordinarily, the murder must occur "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1)(A).  The Second Circuit has stated that:

> The phrase "occurred during the commission of the offense of conviction [in § 1B1.3(a)(1)] is not defined in the Guidelines, nor does the commentary provide any guidance.  The words "relevant conduct" suggest more is required than mere temporal proximity, as the other conduct must be "relevant" and it must occur "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for the offense.

*United States v. Ahders*, 622 F.3d 115, 122 (2d Cir. 2010).

The motives for the November 11, 2004 armed burglary and robbery at the lower apartment of 789 Niagara Street during which defendant Montalvo's felony murders of Nelson and Miguel Comacho occurred are not clear.  But the felony murders were not shown by a preponderance of specific evidence to arise in the course of commission of the defendant's drug conspiracy offense of conviction or in attempting to avoid responsibility for that offense.

The felony murders do not appear to have arisen from any particular cocaine transaction or series of transactions.  The murders occurred 11 months after defendant

Montalvo and the victims ceased participating in one another's cocaine trafficking because of the defendant's sexual assault of Nelson Comacho's 16-year-old girlfriend.

Hildalgo and the juvenile expected to steal money from the victims' apartment on behalf of the defendant. Hildalgo's unimpeached testimony was that he was led to believe that the apartment contained $100,000 of lottery winnings in cash. The juvenile testified he was instructed to look for five kilograms of cocaine. He testified that defendant Montalvo said that there would be five kilograms of cocaine and $10,000 cash in the apartment as the defendant drove them to the vicinity of the victims' apartment. Another witness testified Nelson Comacho owed the defendant money, but did not testify what the debt was for, and others testified the defendant never had a dispute over drugs with Nelson Comacho and that Comacho did not owe the defendant money.

No cocaine or currency were stolen during the burglary and robbery. There is no evidence the thefts were planned specifically to settle a debt or other obligation that arose out of the victims' participation in defendant Montalvo's offense of conviction. No evidence shows that the money that was targeted for theft was to be used to fund cocaine distribution during the defendant's on-going conspiracy. The conflicting evidence that five kilograms of cocaine were targeted for theft was insufficient to establish that purpose for the armed burglary and robbery. No significant amount of drugs or currency were recovered by police at the murder scene.

No evidence suggests that defendant Montalvo supplied cocaine to former cocaine customers of the Comachos after they were murdered. No specific evidence suggests the burglary and robbery were precipitated by any lingering dispute among the defendant and the Comachos over cocaine suppliers, customers or market territory. No

evidence suggests the armed burglary and robbery, and the murders, were intended to send a message to others about the defendant's drug trafficking activities.

Given that defendant Montalvo had been involved in a cocaine trafficking conspiracy with the murder victims for a period of years, it is plausible that he would believe that he could determine when the victims had a quantity of cocaine in their apartment that he might choose to take. Given that he had a serious and emotional falling out with the victims 11 months earlier over his mistreatment of Nelson Comacho's teenaged girlfriend, he might have decided to try to steal cocaine from them to distribute through his on-going cocaine conspiracy offense of conviction.

But it is also plausible that defendant Montalvo was planning to leave Buffalo for New York at the time of the felony murders because of the problems caused by his sexual assault of Nelson Comacho's girlfriend, and that the armed burglary and robbery were revenge for his having concluded that he was being forced to move away. In any event, no specific evidence adequately supports the conclusion that the Comachos' money or drugs were targeted for theft in the course of any part of commission of the defendant's drug conspiracy offense of conviction.

Because defendant Montalvo's felony murders were not proved to have been committed *in the course of* commission of the offense of conviction, they are not relevant conduct to his drug conspiracy offense of conviction. Accordingly, the Guidelines § 2D1.1(d)(1) cross-reference to the murder Guideline at § 2A1.1 does not apply. *See*

*United States v. Taylor*, 813 F.3d 1139, 1150 (8th Cir. 2016)[3].

The United States argues that because it has established that defendant Montalvo aided and abetted the felony murders, that aiding and abetting is sufficient to establish that the murders were relevant conduct triggering the murder cross-reference in Guidelines § 2D1.1(d)(1).  That argument confuses the issues.  The determinative question for relevant conduct purposes is not whether the defendant aided and abetted the felony murders, it is whether the felony murders aided and abetted conduct that was part of the defendant's drug trafficking offense of conviction.  *See* U.S.S.G. § 1B1.3(a)(1)(A).  For the reasons stated above, there is insufficient evidence to conclude that they did.

Similarly, neither has the United States shown that the felony murders can be deemed relevant conduct as part of the same course of conduct or a common plan or scheme as defendant Montalvo's drug conspiracy offense of conviction pursuant to U.S.S.G. § 1B1.3(a)(1)(B).  There is insufficient evidence to conclude that the conduct of Hildalgo, Jonas, and the juvenile in relation to the felony murders was jointly undertaken criminal activity with the defendant "that occurred during the commission of [his] offense of conviction, in preparation for that offense, or in attempting to avoid detection of responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1).

Finally, although the Court agrees with the United States that it has established defendant Montalvo's role in aiding and abetting the felony murders, the murders do not

---

[3] The Second Circuit has not issued a published opinion that may be cited for the requirement that only relevant conduct can trigger application of the murder cross-reference in § 2D1.1(d)(1), but the Circuit has relied upon *Taylor* in at least two unpublished Summary Orders, *United States v. Plaza*, 752 Fed. Appx. 37, 46 (2d Cir. 2018); *United States v. Anderson*, 689 Fed. Appx. 53, 57 (2017), that either apply or note the requirement.

qualify as relevant conduct under U.S.S.G. § 1B1.3(a)(3) as harm resulting from his acts or omission unless it resulted from acts or omissions that that are properly deemed relevant conduct under U.S.S.G. § 1B1.3(a)(1) or (a)(2).  For the reasons the Court has stated, the felony murders are not relevant conduct under either § 1B1.3(a)(1)(A) or (a)(1)(B), and because the murders cannot be grouped with the drug trafficking offense of conviction pursuant to Guidelines § 3D1.2(d) if regarded as multiple counts of conviction, they are not relevant conduct to that offense.  *See e.g.*, *United States v. Kim*, 896 F.2d 678, 684 (2d Cir. 1990) (dictum).  Accordingly, the murder cross-reference at Guidelines § 2D1.1(d)(1) does not apply.

### III.  The Felony Murders Are a Basis for Upward Departure or Variance.

Defendant Montalvo's plea agreement provides that two allegedly death-penalty eligible counts of aiding and abetting discharge of a firearm causing death in violation of 18 U.S.C. § 924(c) that are based upon the felony murders of the Comachos are to be dismissed as part of the plea.  Dkt. No. 284, para. 14.  And because the murder cross-reference at 2D1.1(d)(1) does not apply, the felony murders do not enter into determination of his offense level and applicable Guidelines range.  These circumstances do not mean that his sentence should not reflect the conduct underlying the dismissed counts, however.

Sentencing Guidelines § 5K2.21 provides that:

The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

*Id.* While § 5K2.21 was effective November 1, 2000, Second Circuit case law that preceded the Guideline suggest that dismissed conduct must have some relationship with the offense of conviction to permit an upward departure.  For example, in *United States v. Tropiano*, 50 F.3d 157 (2d Cir. 1995), the Circuit vacated a 5K2.0 upward departure based upon evidence of uncharged cocaine dealing in a case involving stolen vehicles. The Circuit found the departure was not supported by confused findings below that also failed to include sufficiently detailed findings that the cocaine dealing related in some way to the offense of conviction.  50 F.3d at 163-65.

In *United States v. Kim*, 896 F.2d 678 (2d Cir. 1990), another § 5K2.0 upward departure case that preceded *Tropiano, supra*, and the effective date of § 5K2.21, the Second Circuit held that for conduct to justify an upward departure, it must "relate in some way to the offenses of conviction."  896 F.2d at 684.  The Circuit made clear that temporal proximity alone is not enough of a relationship by observing that someone who engaged in a barroom brawl during the course of a fraud conspiracy would not properly be punished by an upward departure for the brawling when sentenced for the fraud. *See id.* & n.4.  It observed that:

> the [United States Sentencing] Commission's carefully explained compromise between "charge offense" sentencing and "real offense" sentencing would be undermined if a sentencing judge could make an upward departure for *any act of misconduct*, regardless of relationship to the offense of conviction.  That approach would be pure "real offense" sentencing, not the "modified real offense" system the Commission adopted.

*Id.* at 863 (emphasis added).  Although Second Circuit has not adopted this line of reasoning in a precedential decision under 5K2.21, the same reasoning generally applies in the context of a departure based upon conduct underlying dismissed charges.  By the

same token, conduct underlying charges that are to be dismissed as part of a plea agreement is not just "any act of misconduct." *Id.*

Section 5K2.21 indicates that an upward departure for conduct underlying dismissed charges is appropriate "to reflect the actual seriousness of the offense," *id.* which seems to confirm the reasoning in *Kim* that the conduct must have some relationship with the offense of conviction to justify the departure. In the *Kim* example, if the barroom brawl does not reflect the seriousness of the fraud offense of conviction, no upward departure should lie. Of course, if conduct underlying dismissed charges is related to an offense of conviction as "relevant conduct," it is properly accounted for in the Guidelines offense level and no departure would be necessary. In any event, the kind or degree of relationship necessary to warrant such a 5K2.21 departure is not well-defined.

Nevertheless, in this case, the Court finds that the felony murders were related to the drug-trafficking offense of conviction. The murder victims were former co-conspirators in defendant Montalvo's drug conspiracy offense of conviction. They were also childhood friends of the defendant's, and during the earlier phase of his conspiracy offense of conviction, he met with them privately about their conspiracy nearly every week in the apartment where the victims were murdered. Evidence about the defendant's interactions with the victims during their participation in his drug trafficking offense of conviction explains how the defendant knew enough about the victims and their two-bedroom apartment to persuade Hildalgo, Jonas, and to a lesser extent, the juvenile, that he could be trusted when he orchestrated the armed burglary and robbery that resulted in the murders.

In addition, the testimony of essential cooperating witnesses against defendant Montalvo during the *Fatico* hearing concerning the felony murders, and who would be witnesses against him during a trial of the two counts of aiding and abetting discharge of a firearm causing death that are to be dismissed pursuant to his plea agreement, overlaps with evidence of his drug conspiracy offense of conviction.  Some of those witnesses' credibility was enhanced because they testified convincingly about what they had learned during their participation in his drug conspiracy.  Although the evidence before the Court does not show that the armed burglary and robbery were relevant conduct in relation to the defendant's offense of conviction, the felony murders were facilitated by the nature and extent of his offense conduct.  And while the defendant did not intend for Jonas to murder his former co-conspirators, the ruthlessness of his planned armed burglary and robbery that resulted in their murder reflects of the nature of the co-conspirator relationships with the victims sufficiently to reflect on the seriousness of his drug conspiracy offense of conviction.  Accordingly, the Court finds that an upward departure or variance to account for the felony murders applies.

## CONCLUSION

For the reasons stated above, the Court finds that the Guidelines § 2D1.1(d)(1) cross-reference to the murder Guideline at § 2A1.1 does not apply in this case, but that an upward departure pursuant to 5K2.21 or an upward variance to account for defendant Misael Montalvo's role in the felony murders of Nelson Comacho and Miguel Comacho is warranted.  The Court will issue a Text Order requiring the parties to address in their sentencing submissions how the Court should determine the extent of an up-

ward departure, *see United States v. Kim*, 896 F2d. 678, 684-85 (2d Cir. 1990), or vari-

ance, to account for defendant Montalvo's role in the felony murders and to address the

nature and extent of any other departures or variances that may apply.

**IT IS SO ORDERED.**

_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  June 17, 2020